I've asked for four minutes. May it please the court my name is Mark Johnson. I represent the Rivera family in this Nevada product liability and tort case. There is no issue before the court relating to statute of limitations. There is no issue before the court of addiction as the injury. The injury is death. This case arises under Nevada law not California law. It seems as though I'm trying to distance myself from the soul of this case. I'm very pleased to be here to answer any questions for any member of the court. Does it matter to us when we read this record that we don't really know a whole lot about what the deceased thought about smoking cigarettes, do we? We do not. But we do have evidence in the record her two friends. Yeah, but they said they were doing the same thing and they're still alive. That's how they could testify. And they said we were doing the same thing. We started together. And they're talking about their experience. They're basing what they think she must have thought on what they thought. Don't we have a record that we don't really know? Oh, no. Your Honor, I beg to differ. Our evidence is good as gold on that. It's the only evidence we can have, first of all, because obviously Mrs. Rivera is deceased. Her husband, they did not meet until 1986. She began smoking at the age of 13 in 1969. Her friend, and this is in the record, her friend Helen Zamlok and Chris Hutchinson, they say when asked why they began smoking, they say it was cool, it was the culture around reds, it was the horse and the Marlboro man, naming all of the components of the Marlboro advertising program and icons. She also said, flat out in the record, this therefore raises a fact issue, they did not appreciate the health hazards involved. So Helen Zamlok, Christine Hutchinson, two lay witnesses, evidence is in the record, good as gold, said they didn't appreciate the health hazards. They were 13-year-old girls. And when Mrs. Rivera died at the age of 42, and there's no issue about what killed her. We have the testimony of four witnesses, four expert physicians in the record. When she died, the Rivera's home was filled with Marlboro equipment, memorabilia, barbecue grills. Jackets, and all the things that you get for redeeming Marlboro miles. So she was a lifelong customer, started smoking 13, addicted, the product killed her. Now, I'd like to address a couple issues that arise, unless there's another question, that arise from the court's order. The district court's order dismissing this case, because it's important. Under the Nevada local rules, the prevailing attorney drafts the order. In this case, Mr. Proctor, who's not here today, but he drafted the order, the court signed it. Now, the court, we are appealing the dismissal of three claims, the strict liability failure to warn claim, the misrepresentation claim, and the fraudulent concealment claim. Two of those claims, the strict liability failure to warn claim, and the fraudulent concealment claim, were dismissed on the basis of preemption, and one other ground each. I'll discuss the preemption issue later. Fraud was not dismissed on a preemption basis. Excuse me, counsel, may I just ask you one question about misrepresentation? Is there any Nevada case law to support the use of circumstantial evidence to establish reliance for a misrepresentation claim? There is not a Nevada case in point, but there is a Nevada jury instruction, and I'd like to discuss that. Thanks for bringing that up, because the defendant's whole case, and you're then familiar with the order. The fraud case was dismissed solely on the basis of lack of reliance, no other grounds. Solely on the basis of lack of reliance, their order, they drafted it. Now, they served requests for admissions on the plaintiff in this case like they serve in all these cases, and requests for admissions, it was like number 21 through 135. All had to do with whether Mr. Rivera, who was answering the questions for the plaintiff's estate, could point to a specific statement, a specific statement, and that was the language, which caused Mrs. Rivera to begin smoking, to allow her to continue smoking, or prevented her from quitting smoking. Of course, like anybody honestly answering those questions, you have to answer the question yes, because mass media advertising is not intended to trigger behavior by a single image, a single event. It's intended to trigger behavior to get the consumer to purchase the product through incessant repetition of the message, incessant repetition of the message. So they served the request for admissions on this, and this is to answer your question. In the request for admissions, they have in their preamble, if you will, of definitions, they say, this is I'm quoting from Philip Morris' request for admissions to the plaintiff. Can I give you the clerk's paper number? I can't right now. Oh, it's ER 55. Okay, so their request for admissions, they provide the following definition. Number five, reliance, rely, relied, or any similar derivation of the word as used throughout these instructions for admission, requests for admission, shall have the same meaning that the word has in Nevada civil jury instruction 9.06 title reliance. These are their requests for admission. They provide the definition, and the definition in Nevada jury instruction 9.06, which we have in the record, says in part, reliance may be shown by direct evidence or may be inferred from the circumstances. That's the Nevada jury instruction. What weight do we give to a jury instruction as opposed to a case? Well, we also cited in our brief cases from other jurisdictions that allow. I asked about Nevada. And there is not a case in point that we can refer you to in Nevada, but we do have the jury instruction. We do have the majority, I think, of the states allow that. And furthermore, it's almost, in a death case, there's almost no other way to prove reliance except through the conduct of the party who is deceased. And her friends, in this case, using the keywords, it was cool, it was the culture around Reds, the horse, the Marlboro man. Where do you think that came from? I mean, that can only have come from Philip Morris' advertising. Now, with respect to the court's order drafted by defense counsel, the fraudulent concealment claim, in addition to the preemption dismissal, they dismissed the case based upon fraudulent concealment claims. Now, the fraudulent concealment claim fails due to lack of evidence that Pamela Rivera ever relied on any representations made by defendant in smoking and making smoking-related decisions. That's the fraudulent concealment claim. So their order says, includes representations, overt representations. They drafted the order, we didn't. So it's a defective, it's not a defective order, we have to accept what it is. There is no proof in a fraudulent concealment claim of showing reliance on representations, because there is no representation. That's their order, they drafted it, so they're stuck with it. Also, they never raised fraudulent concealment in their pleadings. They filed the summary judgment motion, when it came to fraudulent concealment, they only argued preemption. They did not argue in their pleadings, in the summary judgment motion, any sort of reliance or causation element. When we got to the argument, Mr. Proctor made a passing comment about reliance, and they now contend, and you can read his brief, he put the comment in the brief, they now contend that that was sufficient to raise the issue. Well, when I'm standing in front of Judge Mahan in Nevada District Court, I can't go out and get affidavits and information to rebut that. So they didn't raise it in their written pleadings, we were deprived of the time to respond and the opportunity to respond to that fraudulent concealment argument. And they also, in the order, the order says, relied on representations. That is not possible in a case of concealment. The other issue that's raised by the court's order is plaintiff's conspiracy claim fails because it is derivative of the other causes of action. That's the court's order. Derivative of the other causes of action. They now contend in their appellate pleadings that we did not argue, we did not preserve that issue sufficiently for appeal. In our brief, in the statement of issues, we raise the conspiracy issue. We did the court error, we say, did the court error in dismissing the conspiracy claim because it was derivative of the other claims. And we ask the court, at the end of our pleading, to reverse and remand on that issue. There was no need for us to brief or argue the conspiracy claim, the merits of the conspiracy claim, because it was based, and this is their order, solely, it was dismissed solely because it is derivative of the other causes of action. So if this court finds that any of these other causes of action, any of these other causes of action are revivified, then the conspiracy case should also be brought back into the fold. Now, I want to talk about the strict liability failure to warn claim, because there is some issue about the ordinary consumer test. And, again, it was dismissed based upon preemption and the following ground. It fails the applicable consumer expectations test because the risks of smoking and addiction have been known to the ordinary consumer since 1969. We do not believe that that is the test in the state of Nevada. We believe the test is found in two cases, Allison v. Merck, cited in our brief. It's a plurality decision. And a more recent decision, Lewis v. Searay. And, you know, what the Nevada court has adhered to, what it has done, it has stuck to what we perceive to be, what we believe to be, a more pure form of strict liability, in that it does not inject negligence concepts into the analysis. It puts the burden on the manufacturer and not on this ordinary consumer, what do they know, not know. It does not put the burden on the consumer. And the Lewis v. Searay case approves what I believe to be the jury instruction that a Nevada court would give in this case on warnings, strict liability, failure to warn. Justice Breyer, before you sit down, you don't have to cut to it now, tell us in as precise language as you can what you think this Court's holding should be, what the bottom line of our decision should be. You can do it at some point, you've got time. I'll do it right now, Your Honor, thank you. Okay, the two claims that were found to be preempted by Cipollone and by the Cigarette Labeling Act, pardon me, strict liability, failure to warn, fraudulent concealment, they are not. In order to find what, in order to dismiss those claims based upon preemption, this Court must find that there was no other means than advertising or promotion, no other means besides advertising or promotion to warn the public about the dangers of smoking. And, you know, if I came in here this morning and I said to you what they should have done is they should have created a research institute. They should have created a research institute back in 1954, 55, and that research institute, they should have installed a scientist of utmost integrity and undisputable reputation, or whatever the frank statement says. If I came in and said they should do that, that would be going too far, but I don't have to do that because they did it. They created the Council for Tobacco Research, they created the TIRC themselves, and they said, they expressly said, this is what we're going to do, we're going to investigate smoking and health. Your health is paramount to all of our other interests, and we're going to install a scientist that's disinterested from the tobacco industry, and we're going to research the health effects of smoking. They created it. That is the vehicle that they could have warned the public, and they should have warned the public. And what they should have done? What they should have done is they said, we are addicting intentionally minors to our product. This is what they should have said. These are the warnings they should have said. And, of course, you're all sitting there, well, nobody would do that because they would have admitted everything. I don't care. They were doing it. They knew they were doing it. They intentionally marketed, they intentionally sculpted their advertisements and everything else to minors. They knew it was addictive. There's a chilling document in our papers, in our pleadings, which talks about the young child who, and particularly a girl, because they use the term adventurous, and it says, and I'm paraphrasing here a little bit, but it says, once the psychosocial symbolism subsides, the pharmacologic effects take over. What the heck do you think they are saying? They know exactly what they're doing. They are going to get you with the horse, the marble man, the culture, the cool, the reds, and then they're going to addict you, and you are a customer for life, just as Pamela Rivera was, smoking behind her garage, baldhead from chemotherapy, waiting to die. Okay. So what you should do, clearly and unequivocally, Your Honor, you should say the Council for Tobacco Research, this independent research institution, which turned out to be a fake, a fraud, a phony, a sham, a shill, that was the vehicle to warn the public. And it is dishonest, and they used it, of course, just as the opposite. They used it to create doubt about smoking and health. It was a front, a fraud, a fake, a shill, a phony. In fact, it was so bad that it was dissolved by court order in the Master Settlement Agreement. So that is the non-advertising, non-promotion. And they cannot get up here and say that that's advertising and promotion, because it is the antithesis of advertising and promotion. It is a manufacturer, it is an industry coming out and saying, when they knew this, well before 1969, the first warning, it's coming out and saying, our product can kill you. It will kill you. It will probably kill you. Once you start smoking, you can't quit. In 2003, four years after Pamela Rivera is dead and buried, they finally admit it. Philip Morris in USA Today comes out, big ad, says smoking is addictive, and on a more probable than not basis, if you read their statistics, you can't quit once you start. We should get, we should get, what you should do is give us a directed verdict on causation in this case. But the order should clearly say, to answer your question, Your Honor, the order should clearly say  that takes the preemption issue out of it. Now, our other claims, fraud, no preemption issue. We have got tons of evidence in the record about their conduct. We have Michael Hoffman, we have Mr. Goldberg, two Ph.D.s. In addition to, even if you discount the addiction issue, let me take a minute here. Michael Hoffman, business ethicist. In the record, ER 667, 668, pages 19 and 20, ample evidence of health hazards. Chose not to adequately warn. Instead, acted in ways that falsely represented his product and made representations that denied his product was addictive and cancer-causing. Philip Morris concerned himself with profitability and survival rather than any ethical or legal obligations to the health of consumers. Ultimately, Philip Morris displayed a management pattern of conduct consisting of a lack of forthright communication, concealment, failure to appropriately investigate product hazards, and insensitivity to commonly held reasonable ethical standards, resulting in unnecessary harm, including loss of life. None of that denied for purposes of this motion. So I think I have four minutes. Thanks. And now we'll hear from Mr. Collins. Good morning, Your Honors. It's undisputed in this case that Pamela Rivera began smoking in the summer of 1969, which is after the effective date of the amended Labeling Act. And therefore, every pack of cigarettes that she smoked bore the federally mandated warning label, which the Supreme Court in Medtronic characterized as, quote, both necessary and sufficient, close quote. In light of that, the district court properly dismissed the failure to warn and the fraudulent concealment claims on preemption grounds, and then it also correctly dismissed the affirmative fraud and misrepresentation claim for lack of a triable issue on reliance. First, let me address preemption and some of the arguments that Mr. Johnson has made on that issue. The primary argument that plaintiff makes in this case to get around preemption is to argue that it's not with respect to advertising and promotion because the warnings, additional warnings that he says should have been given could have been given in other media. This argument fails both as a matter of federal law and, incidentally, as a matter of Nevada law because the predicate for it in Nevada law doesn't exist. Let's start with the federal issue. Even assuming that Nevada law imposed a duty that would embrace other media than advertising and promotion, it overlooks the plain language of the statute. As the Court noted in Cipollone and then again in the Riley case, the 1969 Act amended the 1965 Act and included, quote, far more sweeping language. That's Riley's description of it. It changed a phrase that referred to statements in the advertising to requirements or prohibitions with respect to advertising or promotion. So it only needs to be with respect to advertising and promotion. It doesn't even actually need to be itself advertising and promotion. And drawing on that broader language, the courts that have addressed the issue, which have included the Eleventh Circuit and the Spain case that Your Honor, Judge Farris was on the panel, and then a variety of other cases that we've cited in our papers have concluded that this other media argument doesn't work. Although this Court has not itself addressed the ñ specifically addressed that question in the context of FICLA, it has in the Taylor AG case addressed it in the context of FIFRA, a pesticide preemption statute. In that case, a directly analogous argument was made. The FIFRA provision, which the Court said is analogous to Chipolone, and indeed it relied extensively on Chipolone in construing the provision there, applies only by its terms to labeling or packaging. And the same argument was made that, okay, it only preempts with respect to labeling or packaging, therefore it doesn't affect the failure to award claim because they could have used advertising in that case. And this Court specifically rejected that, saying that the claim is premised ultimately upon the inadequacy of the product label at page 561. That reasoning applies fully and directly here and makes clear that, as a matter of Federal law, this argument fails. But the predicate also is not there under Nevada law, because the Allison case, on which the plaintiff places great reliance, and also the Fisakis case, both of which are cited in the papers, make clear that Nevada law envisions that the warning will accompany the product. Allison specifically refers to it as accompanying the product, and Fisakis refers to it as, quote, a product must include a warning, close quote. Nevada does not envision that this is a duty that will be carried out through anything other than something that accompanies the product in terms of either labeling or advertising. So the predicate for this argument that Nevada imposes such a duty simply doesn't exist. The fraudulent concealment claims are likewise were correctly held to be preempted. They ultimately rest on the same notion, the same duty, that additional warnings, additional information should have been given beyond what Congress has held as a matter of Federal law is sufficient. And the courts, numerous courts, have held to that effect, as we've cited in our papers, the Spain and the Allgood cases in particular. Summary judgment was also correctly granted on the affirmative fraud claim. Nevada law requires actual reliance. The Blanchard case makes that clear, that it has to be a statement that of which the plaintiff was aware. And the Nevada Power case, the district court construing Nevada law, also made that same requirement explicit. And in this case, the plaintiff simply failed to present sufficient evidence that Pamela Rivera heard, believed, and acted upon any particular statement. As noted, the request for admission could not identify any particular statement. Rather, in the papers below, and indeed in the briefs in this Court, and indeed again today in the argument, there has been reference to the general spirit. That was the way it was put in the opposition below, to the notion that smoking is cool, that we've heard references again to Marlborough culture. That's the ---- She said, I smoked because I thought it was cool. Right. But that actually illustrates why this requirement of identifying the statement that was heard, that was believed, and that was acted upon is so critical in terms of establishing a fraud claim. Because a claim that Marlborough advertising makes smoking look cool is, in fact, not an affirmative statement of fact, that smoking is cool is a statement of non-actionable opinion. But also significantly, it is a preempted claim, because Cipollone clearly holds that image advertising that creates a favorable impression of smoking, that makes it look cool or attractive, is preempted by FICLA. And that is precisely why it is important to identify which statements we're talking about, because actually when you begin to unpack the assertion that is made about the beliefs that were had about smoking and you identify it, it comes from a preempted, non-actionable image advertising theory. And so smoking is cool. Claiming that that was the message that they got from statements from Marlborough advertising is clearly insufficient. Well, let's assume that you're correct in all of this. What troubles me about this case the most is the creation of the Tobacco Industry Research Committee, which apparently, from the record, found the problems with cigarette smoking and tobacco. And none of that information was released to the public. What is your response to the responsibility of the industry in that respect? I'm limited by the procedural posture of this case. We are coming up from a grant of summary judgment in which the summary judgment was focused on specific elements of the case. If the case were to be tried, we would have things to say about what the industry did and its conduct during that period and present its defense. That's why you confined your remarks to preemption and the like. I am, by virtue of the posture, I am focused on the issue of actual reliance. Was there a statement? And that's what the summary judgment was granted on, the failure of proof of actual reliance. The other elements in terms of the posture of the case are ones that, you know, were not specifically challenged. We would have things to say with respect to those that we have in cases that have been tried. But for purposes of this, the focus is on what statements did she hear and did it make any difference. And it's very clear that she can't identify or Mr. Rivera can't identify an affirmative false statement of fact that is actionable under Nevada law as a statement of fact rather than opinion, and that would not, in fact, be preempted by FCLA. In other words, you have many things to say unto us, but this is not the appropriate  That's correct, Your Honor. Although the plaintiff below relied on the 1994 congressional testimony as one of the possible statements that Ms. Rivera heard, that point was not renewed in the relevant section of the opening brief. If you go to the section on justifiable reliance, it is, again, Marlboro culture and image advertising. In any event, as we pointed out in our brief, the plaintiff admitted that those statements had no effect on her smoking behavior, that, as Mr. Rivera said, they were smokers, they were going to continue to smoke at that point. Also, we have indicated in our papers that this activity, obviously the 1994 congressional testimony, is testimony to Congress and therefore is protected by Noor Pennington. The only response in the reply brief to that point was to assert that Noor Pennington does not apply outside the antitrust context. That's exactly the point rejected by this Court in the White v. Lee case that we cited. At page 1231, the Court held that Noor Pennington does, in fact, extend beyond the antitrust context, reflects more general First Amendment concerns, nor could it fit within any sort of sham exception, since the sham exception under Noor Pennington means that you were acting for a purpose other than to secure legislative or judicial action, and there's no contention or allegation or certainly on summary judgment nothing that has been shown that would raise an issue of a sham, and that was actually not even asserted in this case. So that also cannot be an actionable statement. And that was it. That was all that was presented, and that is, as Judge Mahan recognized here, simply not enough to create a triable issue, and that summary judgment was therefore warranted on the affirmative fraud claim. Plaintiff has attempted to get around this by suggesting that it can rely on inferences or cumulative impact, but there is no Nevada authority that will support that. The Committee on Children's Television case has never been adapted in Nevada, which was the basis for the cumulative impact theory. In any event, even within California, the Committee on Children's Television case was limited by Merkin essentially to its facts. Merkin reinterpreted it as a retransmission case. You still have to show the defendant made this statement, and eventually it got to the plaintiff. The plaintiff heard that statement and acted upon it. So even in California, which is a different standard from Nevada, because Nevada hasn't adopted anything like children's television, even under California law it would have failed. The Court does not need to reach the Nevada law issues in this case with respect to failure to warn or lack of reliance on fraudulent concealment, because those are a judgment. The judgment in this case can be affirmed with respect to those issues solely on preemption, and so there is no need to go to those questions. They also, of course, though, provide alternative grounds for affirmance on those claims. The district court correctly applied the consumer expectations test to the Nevada failure to warn claim. The Yamaha Motor and Outboard Marine cases both make clear that there's no duty to warn of commonly known dangers. The Ward and Guinness cases also make clear that under Nevada law, the plaintiff must show that the product is unreasonably dangerous, and that also looks to consumer expectations as a under Nevada law. So therefore ---- If I could ask a question. You said things commonly known. I wondered if it's appropriate for a court to take judicial notice of something as intangible as public knowledge from over three decades ago. Well, in this case, I think common knowledge is particularly appropriate because it is in the context of a failure to warn claim. Any claim, for example, on any other strict liability theory was not raised in the opening brief of point that we pointed out in our answering brief. And with respect to failure to warn, the warning itself creates common knowledge. And I think that the Papike case, I may be mispronouncing that, P-A-P-I-K-E, of this court in the context of another federally mandated warning with respect to tampons provides, I think, an important statement. On page 743, the court said, to rule otherwise, it was talking again about the consumer expectations test, said to rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate. And I think that that rationale applies here. You can't say that under Nevada law, the federal warning is not sufficient to create common knowledge or to set consumer expectations. It does. They claim that Allison, which, of course, is a true justice plurality that wouldn't be binding, eliminates the consumer expectations test, that there is no basis for that because, again, it is a plurality and, in fact, the plurality first applies Guinness's reasonable expectations test right at the beginning of the case at 110 Nevada at 767. Lewis did not involve a danger that was claimed to be commonly known and, therefore, it frankly never reached this issue. It only addressed the issue of whether the warning was adequate to reach a danger as to which no issue of common knowledge had even been asserted. And with respect to the issue of common knowledge itself, once we recognize that Nevada law does require the consumer expectations test, as I said, the Papika case does make clear that the warning itself provides common knowledge in the context of the failure to warn claim here as a matter of law. We also cited in our papers and we presented below sort of a belt and suspenders approach that there was common knowledge as a matter of law within the relevant time period based on all of the case law that we cited, Solomon, Spain, Glassner, Allgood. But we also put in as a matter of fact declarations that would establish common knowledge within the relevant time period. It's important to note that the standard in Nevada is unquestionably an objective standard, which is why it can be decided as a matter of law. That's made clear in the Ward case and is this Court's decision in the Doteville case. D-H-E-D-O-U-V-I-L-L-E makes the same point as well. Unless there are further questions, we would submit that the judgment should be affirmed on the preemption grounds and on the lack of a triable issue of fact on actual reliance. Thank you, Your Honor. Mr. Johnson. Thank you. Mr. Johnson, I know you've been deciding where you want to go, and I hate to take you in a different direction, but it might help if you would say, one, this is a genuine issue of fact that needs to be tried. Two, this is another. And then give us a record cite as to the basis that you rely upon. Can you do that? I think that I can. The genuine issue of material fact and fraud and misrepresentation is contained in the statements of Mr. Hoffman, which I read into the record, Mr. Goldberg, which I read into the record, and the lay witnesses. In other words, that there were statements that clearly that influenced these young kids to begin smoking. We can't point to a specific statement. Anybody that would come up to this Court and say that would ---- You want us to say that summary judgment was inappropriate. You want us to say there are questions that need to be resolved by a tri-effect, and I'm asking you to tell us what those questions are. Okay. What did Pamela Rivera know in 1969? Did she know all of the risks of smoking? That's a fact issue for the jury because her friend Helen Zamlock said they didn't appreciate the hazards. What I would like you to do is I would like you to hold ---- I'll make a deal with you. You decide this case on what the tobacco industry said they would do, the 1954 Frank Statement and the Tobacco Research Council. Just hold them to what they said they're going to do. That's all I ask. And don't hold Pamela Rivera, who was 13 years old when she began smoking, was addicted in a year, and was addicted her entire life, a pharmacologic, a physiologic, not a psychological event. Don't hold her to a higher standard than the last two CEOs of Philip Morris who testified under oath that smoking wasn't addictive. Don't hold her to a ---- I mean, they clearly had some doubt in their mind about it because they testified under oath that it wasn't. So to answer your question, in the Allison v. Merck case, footnote 11, the court cites that it thinks it doesn't really know what the ordinary consumer is. It's a vague standard. And that's why they want to, and they specifically say in footnote 11, they want to return to the principles of strict product liability and failure to warrant. But, you know, I mean, first fraud case, 1600, you know, Sam Goldsmith sold a stone from a goat's stomach to somebody, and the guy lost. It was supposed to be a stone that would cure snakebite, and it turned out that it wasn't. I don't know how you find that. I guess the causation argument there is you get bit by the snake and you die. But we've come a long way. Mass media advertising, incessant repetition of the message, a decade's ---- I would like to follow up on Judge Ferris' question. What specific evidence did you produce to show that defendant's false advertising played a substantial and material part in leading Ms. Rivera to begin smoking and to fail to quit? Okay. All we have is what I have referenced to the court already, and that is the lay witness testimony. We have the testimony of Michael Hoffman, the ethicist Marvin Goldberg, the Ph.D. who wrote about the effect of advertising. We have cited in there three consensus reports by governmental agencies. I think there's six reports cited in our brief, all attached to the declaration of Marvin Goldberg, how advertising influences children to begin smoking. We have the statements by Mr. Hoffman about the decades-long fraud. I read directly in my opening to you in the record, from the record, those statements. And so to end, just hold them to what they say they were going to do. And there are triable factual issues. You know, the Council for Tobacco Research, it's their vehicle. They offered it up as being an independent organization that would discuss and warn people about the health risks of smoking, and they didn't do it. It was a fraud. It was a front. It was a fake. And I appreciate your time. Thank you. Thank you, Counsel, for excellent arguments. And Rivera versus Floyd Norman. Yes, but today I'm fine. If you are, I'm fine. Thank you. We will proceed. We just have one more case to be argued. And we will cover it now rather than take a break. Next commission will be Philip Morris. And on this case, we have Mr. Daniel Smith for a vote. Please vote.
judges: D.W. Nelson, Kleinfeld, Gould